1

2

3

4

5

6

7             IN THE UNITED STATES DISTRICT COURT FOR THE

8                    EASTERN DISTRICT OF CALIFORNIA

9

PAMELA KRUSE,                    )       1:10cv01399 LJO DLB
10                               )
              Plaintiff,         )       FINDINGS AND RECOMMENDATIONS
11                               )       REGARDING PLAINTIFF'S
                                 )       SOCIAL SECURITY COMPLAINT
12                               )
      vs.                        )
13                               )
MICHAEL J. ASTRUE, Commissioner of )
14  Social Security,             )
                                 )
15            Defendant.         )
                                 )
16  _____  )

                          **BACKGROUND**
17

18        Plaintiff Pamela Kruse ("Plaintiff") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance
19

20  Benefits ("DIB") pursuant to Title II of the Social Security Act.  The matter is currently before the

Court on the parties' briefs, which were submitted, without oral argument, to the Magistrate Judge
21

22  for findings and recommendations to the District Court.

                  **FACTS AND PRIOR PROCEEDINGS**[1]
23

24        Plaintiff filed for DIB on February 6, 2006.  AR 80-82.  She alleged disability since June 22,

25  2005, due to severe osteoarthritis of the neck, weakness in her left arm, numbness in the fingers of

26        _____

          [1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.
27

28                                          1

1   her left hand and headaches.  AR 80, 101-07.  After being denied initially and on reconsideration,

2   Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 65-68, 70-73, 76.

3   On May 16, 2008, ALJ James M. Mitchell held a hearing.  AR 7-48.  ALJ Mitchell denied benefits

4   on October 14, 2008.  AR 54-64.  On June 3, 2010, the Appeals Council denied review.  AR 1-4.

5          Hearing Testimony

6          ALJ Mitchell held a hearing on May 16, 2008, in Stockton, California.  Plaintiff appeared

7   with her attorney, Jeffrey Milam.  Vocational expert ("VE") Stephen Schmidt also appeared.  AR 7.

8          Plaintiff was born in 1955.  She earned a GED and completed one semester of college.  She

9   stopped working in June 2005.  From April 2004 to June 2005, she worked as a school bus driver.

10  From March 1990 to January 2002, she worked in retail, setting up display counters.  In 2002, she

11  worked as a loan officer.  She could not return to those jobs because of pain on her left side, from her

12  neck to arm.  AR 9-16.

13         Plaintiff lives in a house with her husband and her twenty-five year old son.  She prepares

14  meals once or twice a day.  She washes dishes three times a week.  She does not mop floors, but

15  sweeps twice a month and dusts four times a month.  She goes shopping twice a month.  She watches

16  television for 1 to 1 ½ hours and reads about 1 hour each day.  She does not go to church, but leaves

17  the house three or four times a week.  Although she has a driver's license, she has not driven for

18  three months.  AR 18-23.

19         Plaintiff's primary medical doctor is Dr. LeFevre.  She has been seeing him for about four

20  years.  He told her not to lift anything over five pounds and to nap regularly because of her

21  medication.  She has been seeing Dr. Gill, a mental health professional, for the last year "as needed."

22  She also received treatment for a drug or alcohol problem in 2002.  AR 23-25.

23         Plaintiff testified that she can stand about 15 minutes and sit about 30 minutes.  She can walk

24  about three blocks.  She can put on her own socks and shoes.  She is right handed and has no

25  problems reaching in front of her or reaching to the side.  She has problems reaching overhead with

26  her left arm because of pain.  She also has problems holding things with her left arm.  She does not

27  have problems picking up things with her right hand, but she has problems grasping with her left

28

2

1  hand.  She feels tingling and numbness in her left hand.  She does not have any problems telling the

2  difference between hot and cold water with her hands.  She has no problems writing, speaking or

3  hearing.  She has problems turning her head from left to right or looking down.  She has no problems

4  using a telephone and uses it three or four times a day.  She also uses a cell phone three or four times

5  a day.  AR 26-29.  She can reach and grab with her left hand for about two hours total in a day.

6  There is nothing wrong with her right hand or arm.  AR 35-37.

7        Plaintiff explained that her main complaint is her neck and left hand.  On an average day, the

8  pain is constant, severe, sharp and throbbing.  She cannot concentrate and is depressed.  AR 30-33.

9  She takes pain medication, including methadone, but the pain doesn't change.  She uses a neck collar

10  and gets injections about three to five times a year.  She sleeps 12 to 13 hours a day because she is

11  tired all the time and in pain.  AR 33-35.

12        The VE described Plaintiff's past relevant work as driver, 913.663-018, medium, SVP 3;

13  displayer, 398.081-010, medium, SVP 6; loan clerk, 205.367-022, sedentary, SVP 4.  The loan clerk

14  position would have transferability to other sedentary office positions.  AR 40.

15        For the first hypothetical, the ALJ asked the VE to assume an individual 52 years of age, with

16  a high school education, one semester of college, and Plaintiff's work history.  This person could lift,

17  push, pull 20 occasionally, 10 frequently, could walk/stand frequently, and could sit, stoop or bend

18  occasionally.  The VE testified that this person could not perform Plaintiff's past relevant work.

19  However, this person could perform other semiskilled jobs in the regional economy, including file

20  clerk and general clerk.  Additionally, there would be unskilled jobs, including cashier and

21  assembler.  AR 41-42.

22        For the second hypothetical, the ALJ asked the VE to assume the person was unlimited in

23  attention, concentration, understanding and memory.  This person had diminished, but correctable

24  vision, and unlimited hearing.  This person was slightly limited, six hours or less, in overhead reach

25  with the left nondominant feature.  Fine and gross manipulative ability was slightly limited with

26  respect to the nondominant feature, but unrestricted with respect to the right.  This person also was

27  slightly limited in the ability to do a simple routine task.  She had no environmental restrictions.  She

28                                         3

1   could have unlimited public contact and occasional supervision.  She had slight to moderate pain.

2   The VE testified that there would be complete erosion of the assembler job, but no erosion of the

3   other jobs.  AR 42.

4        For hypothetical 2A, the ALJ asked the VE to assume a person that was slightly limited in

5   attention, concentration, understanding and memory, and was moderately limited in overhead reach

6   with the left, nondominant feature.  The VE testified that there would be no erosion of the previously

7   mentioned jobs.  AR 42.

8        For hypothetical 2B, the ALJ asked the VE to assume a person with moderate to severe pain,

9   moderate limitations in fine and gross manipulative abilities with the left nondominant feature, and

10  with a slightly limited ability to do SRT.  The VE testified that there would be complete erosion of

11  the previously mentioned jobs.  AR 42-43.

12       For hypothetical three, the ALJ asked the VE to assume an individual 52 years of age, with a

13  high school education, one semester of college and Plaintiff's work history.  This person could lift,

14  push, and pull ten occasionally, five frequently, could walk, stand, stoop and bend occasionally and

15  could sit frequently.  The VE testified that this person could return to Plaintiff's past relevant work

16  as a loan clerk.  The VE further testified that there would be semiskilled and unskilled jobs this

17  person could perform, including receptionist, data entry, information clerk, and assembly.  AR 43.

18       For hypothetical four, the ALJ asked the VE to assume a person who was unlimited in

19  attention, concentration, understanding and memory.  Her vision was diminished, but correctable,

20  and her hearing was unlimited.  She was slightly limited in overhead reach with the left nondominant

21  feature, but the right was intact.  She was slightly limited in the ability to do SRT.  She had no

22  environmental restrictions.  She could have unlimited public contact and needed occasional

23  supervision.  Her pain was slight to moderate.  The VE testified that this person could return to

24  Plaintiff's past relevant work as a loan clerk, but there would be complete erosion of the data entry

25  and assembly work.  AR 43-44.

26       For hypothetical 4A, the ALJ asked the VE to assume a person who was slightly limited in

27  attention, concentration, understanding and memory.  She was moderately limited (three hours or

28                                          4

1  less per shift) in overhead reach with the left nondominant feature.  The VE testified that this person

2  could return to Plaintiff's past relevant work as a loan clerk.  There was no erosion of the previously

3  mentioned jobs.  AR 44.

4        For hypothetical 4B, the ALJ asked the VE to assume a pain level described as moderate to

5  severe requiring frequent medication.  This person would be moderately limited in both fine and

6  gross manipulative abilities with the left nondominant feature, but remained only slightly limited in

7  the ability to do SRT.  The VE testified that this person could not return to Plaintiff's past relevant

8  work as a loan clerk and there would be complete erosion of the previously mentioned jobs.  AR 44.

9        For the next hypothetical, Plaintiff's attorney asked the VE to assume a light RFC with an

10  inability to move the neck in various directions more than ten percent of a day.  The VE testified that

11  it would eliminate Plaintiff's past relevant jobs.  AR 45.  The VE further clarified that if a person

12  could do the full range of sedentary or light work, but could not move the neck in any direction more

13  than ten percent of the day, it would eliminate her sedentary past relevant work as a loan clerk.

14  Additionally, if the person could perform the full range of sedentary or light work, but had to

15  alternate sitting and standing every 15 minutes of the day, it would eliminate the past relevant work.

16  If the person could perform the full range of sedentary and light work, but was restricted to

17  occasional reaching, handling, pushing, pulling, grasping and fine manipulation with the left upper

18  extremity, the person could not do Plaintiff's past relevant work.   AR 45-46.

19        For the next hypothetical, Plaintiff's attorney asked the VE to consider a person who was

20  limited to no more than six hours out of eight sitting and no more then six hours out of eight standing

21  and walking, could lift 20 pounds occasionally, 10 frequently, could feel occasionally with the left

22  upper extremity and could reach occasionally in all directions with the left upper extremity.  The VE

23  testified that this person would not be able to do past relevant work.  If she could not reach forward,

24  to the sides or up for more than a third of the day, then it would preclude the other jobs.  AR 46-47.

25        Medical Record

26        During the course of 2004, Plaintiff reported recurring neck pain and left arm numbness.  AR

27  482-88, 492.  At least one physician believed Plaintiff's diffuse complaints of pain were suggestive

28                                                     5

of a rheumatologic etiology.  AR 486-87.

On January 18, 2005, Plaintiff was diagnosed with cervical spondylolisthis.  AR 493.  A cervical spine x-ray showed reversal of the normal lordotice curvature of the cervical spine and moderate to significant degenerative changes.  AR 186.

On March 21, 2005, Plaintiff saw Dr. Hans U. Bueff for complaints of neck pain, left-sided arm pain, along with left hand weakness and some numbness.  She did not drop objects and her EMG nerve conduction studies were basically normal.  Plaintiff told Dr. Bueff that she was taking sulindac and six Vicodin per day, but continued to drive a school bus.  On physical examination, Plaintiff had decreased rotation of the cervical spine in all directions, but had good range of motion of both shoulder and elbow joints.  Following a review of X-rays and a MRI, Dr. Bueff diagnosed chronic neck pain due to advanced cervical spondylosis with spondylolisthesis C4 on C5 and cervical spondylosis C5-C7.  Due to advanced degenerative changes involving her whole cervical spine, Dr. Bueff believed she might benefit from a facet injection and acupuncture.  AR 140-41.

On May 11, 2005, Plaintiff consulted Dr. R. LeFevre regarding her worsening neck pain.  AR 168.  He prescribed Norco.  AR 169.

On June 28, 2005, Plaintiff had diminished range of motion of her cervical spine.  Per Dr. Bueff, Plaintiff would require spine stabilization.  AR 210.

On July 5, 2005, Plaintiff complained of new onset increased neck pain.  A CT scan showed no significant interval change since November 2004.  There were degenerative changes and alignment abnormalities in the cervical spine.  AR 137.  On July 28, 2005, Dr. Bueff recommended a cervical epidural steroid injection.  AR 142, 211.

On August 22, 2005, Plaintiff complained of left forearm pain.  On examination, she was tender at the carpal tunnel syndrome area.  AR 205-06.

In August 2005, Plaintiff received a tri-level left cervical facet injection.  AR 136.  In September 2005, Plaintiff received a left cervical trigger point injection.  AR 135.

On October 19, 2005, Plaintiff sought follow-up treatment for left wrist pain.  Plaintiff's EMG/NCS showed mild carpal tunnel syndrome.  AR 182, 195.  Plaintiff received a steroid injection

1   to her left wrist.  AR 182.

2        On October 26, 2005. Plaintiff received a multilevel right cervical facet injection AR 134.

3        On November 3, 2005, Plaintiff underwent facet injections.  AR 184.  Thereafter, on

4   November 23, 2005, Plaintiff complained of neck pain despite injections to her facet joints.  Dr.

5   Bueff believed that Plaintiff might benefit from anterior cervical diskectomy and fusion, C4-C6.

6   Plaintiff maintained temporary total disability.  AR 143.

7        On November 29, 2005, Plaintiff again saw Dr. LeFevre and reported increased pain and

8   headaches.  She could turn her head to the left, but it hurt.  On physical examination, she had diffuse

9   tenderness on both sides of her neck, left trapezius greater than the right.  Plaintiff said that Norco

10   and Flexeril did not help and Dr. LeFevre prescribed new medications.  AR 177-78.

11        On December 5, 2005, Plaintiff underwent an initial evaluation for physical therapy.  When

12   she failed to show for a follow-up appointment, she was discharged.  AR 196.

13        In January 2006, Dr. LeFevre prescribed Norco, methadone and other medications.  AR 179.

14   In February, Dr. LeFevre increased the methadone.  AR 223.  In March, Dr. LeFevre opined that

15   Plaintiff was doing well with methadone.  He refilled her prescription for 4-6 tablets every six hours.

16   AR 233.  On March 9, 2006, Plaintiff reported that the methadone helped a fair amount.  She was

17   able to lay tile and finish stain on furniture.  AR 533-34.  On April 26, 2006, Plaintiff reported that

18   she did not start Paxil since she was feeling better.  Dr. LeFevre prescribed 8-10 tablets of

19   methadone every 6-8 hours for intractable neck pain.  AR 319.

20        On April 29, 2006, Dr. Erik Roberson completed a consultative orthopedic evaluation.

21   Plaintiff complained of neck pain.  On physical examination, Plaintiff had no difficulty walking into

22   the exam room and sat comfortably throughout the interview.  She was able to get up on the

23   examination table and sit up from a supine position.  She was able to remove and replace her shoes

24   and socks without much difficulty.  She was able to stand from a chair without pushing with her

25   arms.  Her basic gait was unremarkable.  She was able to stand on either leg and to hop on both feet.

26   She was able to squat fully and return to a standing position.  She had no spasms or back tenderness.

27   Her muscle bulk and tone were normal and her power was 5/5 bilaterally.  Her fine dextrous

28

movements of the hands were normal bilaterally.  Dr. Roberson diagnosed degenerative disease of the cervical spine and noted that she was scheduled for a C3-C4 fusion.  Given the objective findings, Dr. Roberson opined that Plaintiff could be expected to stand six hours in an eight-hour day and sit without restrictions.  She could lift and carry 25 pounds frequently and 50 pounds occasionally.  She had no postural, manipulative or environmental limitations.  AR 228-31.

On May 26, 2006, Dr. Bueff noted that Plaintiff was taking 8-10 methadone tablets every 6-8 hours, along with Norco, baclofen and other medications.  He opined that she was "dependent on narcotics."  AR 316-17.

On May 27, 2006, Plaintiff underwent an anterior cervical diskectomy and fusion C4 to C6.  Her postoperative course was significant for intractable pain.  On discharge, she ambulated without any problem.  AR 457.  While in the hospital, a psychiatric evaluation showed severe narcotic dependence.  She was to simplify her pain regimen and taper slowly.  AR 468-69.

On June 5, 2006, Plaintiff saw Dr. LeFevre.  She reported doing better and that her methadone was giving her good pain relief.  She wanted to decrease her medications.  AR 315.  On June 13, 2006, Plaintiff again saw Dr. LeFevre and reported that she was doing better.  He prescribed ibuprofen and methadone.  AR 314.

On June 26, 2006, Plaintiff saw Richard Boggs, PA, for a post-operation follow-up appointment.  She complained of continuous pain to her neck worse than before her operation.  PA Boggs noted that Plaintiff was taking 400mg of methadone per day, which "was not prescribed by Dr. Bueff, and was never condoned, and especially at this dosage." On examination, Plaintiff had a depressed mood and was very anxious and agitated.  She had abnormal active and passive range of motion of her neck.  PA Boggs was unable to examine Plaintiff due to pain.  He discussed her examination with Dr. Bueff.  AR 288-89.

On July 5, 2006, Dr. LeFevre received a message from Dr. Bueff.  Dr. Bueff reportedly was "very concerned" that Plaintiff had an addiction problem because her pain had not completely disappeared post operation.  According to Dr. LeFevre, there was no indication that Plaintiff had a medication abuse problem.  AR 412.

8

A CT of the cervical spine showed the anatomic alignment to be near normal.  AR 435.

On July 13, 2006, Dr. LeFevre noted that Plaintiff was doing better.  AR 412.

On July 27, 2006, Plaintiff reported to Dr. LeFevre that her pain was worse than it was before surgery.  She said that she could not look up or turn to the left at all.  She was prescribed actiq, methadone, and xanax.  Dr. LeFevre discussed the meaning of being "opioid dependent," explaining that is was similar to having insulin dependent diabetes.  AR 312, 411-12.

On August 2, 2006, Plaintiff's symptoms continued to be very bothersome.  Dr. Bueff recommended a TENS unit and physical therapy.  AR 285.

On August 15, 2006, A. R. Garcia, a state agency physician, completed a Psychiatric Review Technique.  Dr. Garcia opined that Plaintiff's mental impairment was not severe.  AR 236.

On August 17, 2006, Plaintiff saw Dr. Bueff and reported that her symptoms were slightly better three months after surgery.  Dr. Bueff recommended a selective facet block at the C2-3 level.  AR 282.

On September 25, 2006, Plaintiff saw Dr. Michael D. Reitz and received a left C2-3 facet block.  She did not experience relief after the injection, which suggested that this facet was not her primary pain generator.  AR 267.

On September 26, 2006, Plaintiff saw Dr. Marie Montfort for hip pain.  On examination, she had hip tenderness with normal range of motion.  She was tearful and sad, but refused antidepressants.  AR 410-11.  A subsequent x-ray showed normal bilateral hips and pelvis.  AR 414.

On September 28, 2006, Plaintiff told Dr. LeFevre that her pain levels were 5-6/10 up to a 9/10.  She was not resting during the day and tried to keep busy.  Dr. LeFevre prescribed a benzoin tincture, a duragesic, actiq, and methadone.  AR 309.

On October 11, 2006, Plaintiff underwent a left C3-4 facet joint injection.  AR 266.  She reportedly experienced two or three days of relief after the injection.  AR 265.  On October 18, 2006, she received a C2-3 left facet injection.  AR 300.  Dr. Reitz later indicated that Plaintiff's facet joint blocks failed to produce any significant relief and they would not pursue other injections.  AR 264.

On November 2, 2006, Plaintiff reported continued severe neck pain.  On examination, she

9

had decreased range of motion of the cervical spine.  Dr. Bueff opined that Plaintiff was "not doing well," was permanently disabled and would not return to gainful employment.  He recommended a selective nerve root block of C2 on the left and a facet block C2-3 and C3-4 at the same time, stating Plaintiff's "DJD [was] so severe that all injections together might help better."  AR 277.

On November 22, 2006, Dr. Reitz administered left great occipital and left C2-3/C3-4 facet blocks.  AR 298.

On November 27, 2006, Plaintiff told Dr. LeFevre that she felt better for a couple of days after the facet injections and was able to turn to the left, but the improvement did not last.  On examination, she walked stiffly with decreased mobility of the neck.  Dr. LeFevre prescribed methadone, actiq, duragesic, xanax and baclofen.  AR 308.

On February 8, 2007, Plaintiff told Dr. LeFevre that decreasing her methadone caused increased pain.  She denied depression.  AR 408.

On February 14, 2007, Plaintiff received a C3-4 facet intervention.  AR 429.

On February 15, 2007, Dr. Bueff indicated that Plaintiff was "doing fair."  She had a new facet block and her pain was a 2.  On examination, she had decreased range of motion of her cervical spine.  AR 329.

On March 16, 2007, Dr. Madelaine Aquino, M.D., completed a consultative orthopedic evaluation.  Plaintiff complained of constant neck pain with occasional radiation to the upper extremities causing weakness and numbness of the left upper extremity.  During the examination, Plaintiff was able to ambulate with a normal gait pattern and was able to tolerate sitting during the examination.  She would move her entire upper body whenever she turned side to side.  On physical examination, she had mild tightness of the cervical paraspinals with tenderness to palpation from the base of the skull down to the T1 level.  She had decreased range of motion of the cervical spine in all planes.  There was no evidence of muscle atrophy in the upper and lower extremities.  She had decreased light touch sensation in the distal upper extremities with no specific dermatomal distribution.  Plaintiff had no significant motor deficits and only mild sensory deficits, but there was no specific dermatome distribution corresponding to her areas of pathology. The main finding was a

1   limitation of range of motion of cervical spine due to the surgical fusion.  Dr. Aquino opined that

2   Plaintiff should be able to stand and walk about six hours in an eight-hour workday, could sit about

3   six hours in an eight-hour day with regular breaks, could lift and carry 10 pounds frequently and 20

4   pounds occasionally.  She also should avoid any above head activities and no stooping, crouching or

5   crawling because of the limitation of her range of motion of the cervical spine.  Dr. Aquino further

6   opined that Plaintiff may occasionally feel, but there were no limitations with grasping or fingering

7   and she could occasionally reach.  AR 330-34.

8        On April 26, 2007, J. V. Glaser, a state agency medical consultant, completed a Physical

9   Residual Functional Capacity Assessment form.  Dr. Glaser opined that Plaintiff could lift and carry

10  20 pounds occasionally, 10 pounds frequently, could stand and/or walk about 6 hours in an 8-hour

11  workday, could sit about 6 hours in an 8-hour workday and could push and/or pull without

12  limitation.  Plaintiff also could climb ramps or stairs occasionally, but could never balance and

13  should avoid tasks requiring hyperextension of the neck.  She frequently could balance, stoop, kneel,

14  crouch and crawl,  Her reaching and feeling were limited, but her handling and fingering were

15  unlimited.  She must avoid all overhead tasks.  She could perform ring feeling on an occasional

16  basis. AR 338-42.

17       On April 30, 2007, Plaintiff told Dr. Reitz she had experienced seven weeks of pain relief

18  since the prior injection.  She received another left C3-4 facet injection.  AR 428.

19       On June 13, 2007, Dr. LeFevre increased Plaintiff's methadone because her pain was still

20  "miserable."  He also suggested a mental health appointment for anxiety and depression.  AR 380.

21       On June 25, 2007, Plaintiff saw Dr. Reitz for an additional C3-4 facet injection.  She reported

22  no significant relief from her last C3-4 injection. AR 427.

23       On July 27, 2007, Plaintiff was referred by her lawyer to Dr. Harwant Kaur Gill for

24  evaluation and treatment of depression.  Plaintiff complained of a depressed mood, crying spells,

25  insomnia, decreased energy, decreased concentration and hopelessness about her chronic neck pain.

26  She denied any other current stressors.  On mental status exam, Plaintiff had mild psychomotor

27  retardation and was moderately depressed.  Dr. Gill diagnosed depression, major, recurrent with a

28

1   Global Assessment of Functioning ("GAF") of 61-70 with mild symptoms.  Dr. Gill prescribed

2   Venlafaxin.  Plaintiff declined outpatient treatment.  AR 353.

3         Plaintiff had a follow-up appointment with Dr. Gill for medication management on August

4   13, 2007.  Dr. Gill indicated that there were no changes in her assessment.  He assigned her a GAF of

5   71-80 with transient symptoms.  As Plaintiff reported intolerable side effects from Venlafaxin, she

6   was prescribed Paxil.  AR 354-55.

7         On August 1, 2007, Plaintiff saw Dr. Sun Duk Hansrote for complaints of left hand weakness

8   and numbness.  On examination, Plaintiff had no focal weakness/atrophy in her left upper extremity.

9   She had positive Tinel's at the left ulnar with decreased light touch at the left medial hand.  A prior

10  EMG report showed mild conduction slowing in the left median nerve at the wrist.  AR 377-78.  An

11  electrodiagnostic study of Plaintiff's left hand completed in August 2007 was normal.  Plaintiff was

12  given an intramuscular Botox injection.  AR 378.

13        On September 4, 2007, Plaintiff complained to Dr. Bueff of left sided arm pain, which was

14  not truly dermatomal.  She had normal left arm strength.  AR 456.

15        On September 18, 2007, Dr. Bueff completed a Questionnaire form.  He opined that

16  Plaintiff's medical problems precluded her from performing any full-time work at any exertional

17  level.  Her primary impairments were chronic pain syndrome, cervical fusion, and failed

18  improvement after surgery.  Dr. Bueff did not identify how long Plaintiff could sit, stand or walk.

19  Instead, he opined that the Plaintiff's pain was "so severe" that she could not do any work because of

20  severe cervical arthritis and chronic pain syndrome.  He believed that she had been disabled to this

21  degree since the day of her surgery.  AR 355-57.

22        A cervical spine MRI completed on September 25, 2007, showed mild left foraminal

23  narrowing at C3-4 and mild thecal sac compression at C6-7.  AR 404.

24        Plaintiff saw Dr. LeFevre on October 5, 2007.  She reported a good result with L3-4 facets

25  for up to 6 weeks and her pain level was down.  AR 377.  He encouraged her to have an epidural and

26  pursue the possibility of rhizotomy.  He also noted that he filled out a questionnaire "to help file for

27  disability."  AR 378.  On the Questionnaire form, Dr. LeFevre opined that Plaintiff's medical

28                                              12

problems precluded her from performing any full-time work at any exertional level.  Her primary impairments included severe pain with any neck movement, weakness and pain in her arms and an inability to turn her neck side to side.  She could sit for 15 minutes in an 8-hour day, stand/walk 15 minutes in 8-hour day and must lie down or elevate her legs for 3 hours in an 8-hour day.  Dr. LeFevre based his opinion on Plaintiff's inability to move her neck.  She also was unable to use her arms and hand, and she could not lift, reach, handle, feel, push/pull, or grasp.  AR 358-59.

On March 11, 2008, Plaintiff saw Dr. John Gallo for complaints of anxiety.  She reported taking 10 to 12 methadone at a time for her chronic pain, but would like to taper back.  AR 522-23.

A subsequent cervical spine x-ray showed slight reversal of the usual cervical lordosis and moderate changes of spondylosis.  AR 402.

On April 10, 2008, Dr. Montfort counseled Plaintiff on her medications and chronic pain.  Plaintiff was to begin weaning herself off of medications and try exercise for her depression.  AR 374.  The next day, Dr. LeFevre directed her to continue with methadone and actiq.  AR 373.

ALJ's Findings

The ALJ found that Plaintiff met the insured status requirements through March 31, 2010, and had not engaged in substantial gainful activity since June 22, 2005.  The ALJ further found that Plaintiff had a severe cervical impairment.  Despite this impairment, Plaintiff retained the residual functional capacity ("RFC") to perform light work, except that she had slightly limited attention, concentration, understanding, and memory because of her slight to moderate pain, which required occasional medication.  Her reaching with the left, nondominant upper extremity was moderately limited overhead, and she had slight fine and gross manipulation restriction with her left upper extremity.  She could sit, stoop and bend occasionally.  With this RFC, the ALJ concluded that Plaintiff could not perform any past relevant work, but had skills transferable to other jobs in the national economy.  AR 59-64.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the

1   Court must determine whether the decision of the Commissioner is supported by substantial

2   evidence. 42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson*

3   *v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514

4   F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might

5   accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole

6   must be considered, weighing both the evidence that supports and the evidence that detracts from the

7   Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the

8   evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*,

9   *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the

10   Commissioner's determination that the claimant is not disabled if the Commissioner applied the

11   proper legal standards, and if the Commissioner's findings are supported by substantial evidence.

12   *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

13                                          **REVIEW**

14          In order to qualify for benefits, a claimant must establish that she is unable to engage in

15   substantial gainful activity due to a medically determinable physical or mental impairment which has

16   lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §

17   1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of such

18   severity that she is not only unable to do her previous work, but cannot, considering her age,

19   education, and work experience, engage in any other kind of substantial gainful work which exists in

20   the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden

21   is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

22          In an effort to achieve uniformity of decisions, the Commissioner has promulgated

23   regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §

24   404.1520(a)-(g).  Applying the process in this case, the ALJ found that Plaintiff: (1) had not engaged

25   in substantial gainful activity since June 22, 2005; (2) has an impairment or a combination of

26   impairments that is considered "severe" (cervical impairment) based on the requirements in the

27   Regulations (20 C.F.R. § 404.1520(c); (3) does not have an impairment or combination of

28                                            14

1    impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P,

2    Regulations No. 4; (4) cannot perform her past relevant work; but (5) has transferable skills to

3    perform other jobs that exist in significant numbers in the national economy.  AR 59-64.

4         Here, Plaintiff contends that the ALJ erred by: (1) discounting her credibility; (2) rejecting

5    the opinion of consultative examiner, Dr. Aquino; (2) rejecting the opinions of her treating

6    physicians, Drs. Bueff and LeFevre; (3) failing to consider the effects of her mental impairments; and

7    (5) failing to establish that there were other jobs in the national economy that she could perform.

8                                    **DISCUSSION**

9    A.    Credibility Determination

10        Plaintiff first argues that the ALJ's credibility finding was inadequate and unsupported by

11   clear and convincing reasons.  Absent evidence showing that a claimant is malingering, an ALJ must

12   set forth "clear and convincing" reasons for rejecting pain testimony.  *Valentine v. Comm'r Soc. Sec.*

13   *Admin.*, 574 F.3d 685, 693 (9th Cir. 2009).

14        Here, the Commissioner contends that the ALJ's credibility determination is supported by

15   record evidence suggesting malingering.  *Smolen v. Chater*, 80 F.3d 1273, 1283-84 (9th Cir. 1993)

16   (ALJ must make specific findings and state clear and convincing reasons to reject a claimant's

17   symptom testimony unless affirmative evidence of malingering is suggested in the record).  In

18   particular, the Commissioner points to the ALJ's express citation of Plaintiff's statements to Dr.

19   Roberson that she had constant radiating pain, but she was able to sit comfortably throughout the

20   interview, had no difficulty walking, was able to get onto the examination table, was able to sit up

21   from a supine position, and was able to remove and replace and her shoes and socks without much

22   difficulty.  AR 60-61, 228-31.  Plaintiff counters that neither the ALJ nor any physician made

23   explicit findings of malingering.  While Plaintiff is correct, it is clear that the ALJ relied on record

24   evidence suggesting, at a minimum, inconsistency and exaggeration of pain symptoms.  An ALJ may

25   properly consider exaggerated complaints in discounting a claimant's credibility.  *Thomas v.*

26   *Barnhart*, 278 F.3d 947, 958-59 (9th Cir.2002); *Tonapeytan v. Halter*, 242 F.3d 1144, 1148 (9th Cir.

27   2001) (ALJ may use "ordinary techniques of credibility evaluation," including consideration of

28

15

1   inconsistent statements).  Indeed, the ALJ contrasted Plaintiff's assertions of *constant* pain with her

2   lack of pain and lack of physical difficulties during examination by Dr. Roberson.  In a similar

3   fashion, the ALJ noted that in a later orthopedic evaluation, Plaintiff again reported constant sharp

4   and radiating pain with occasional weakness and numbness, but the examining doctor found no

5   significant motor deficits and no evidence of any muscle atrophy.  The examining doctor also found

6   that the distribution of Plaintiff's mild sensory deficits did not correspond with her areas of

7   pathology.  AR 61, 330-34.  Thus, the ALJ did not err in considering records of inconsistent reports

8   and exaggeration of pain in his credibility determination.

9       Plaintiff also contends that the ALJ "entirely failed to consider the seven criteria for

10  evaluation of credibility" set forth in Social Security Ruling ("SSR") 96-7p.  SSR 96-7p provides

11  factors that may be considered to determine a claimant's credibility, such as: 1) the individual's daily

12  activities; 2) the location, duration, frequency, and intensity of the individual's pain and other

13  symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness,

14  and side effects of any medication the individual takes or has taken to alleviate pain or other

15  symptoms; 5) treatment, other than medication, the individual receives or has received for relief of

16  pain or other symptoms; 6) any measures other than treatment the individual uses or has used to

17  relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes

18  every hour, or sleeping on a board); and 7) any other factors concerning the individual's functional

19  limitations and restrictions due to pain or other symptoms. SSR 96-7p.  An ALJ is not required to

20  discuss and analyze each and every one of the factors enumerated in SSR 96-7p. *See, e.g., Howard*

21  *v. Astrue*, 2010 WL 546715, *13 (E.D. Cal. Feb. 10, 2010) (plaintiff incorrectly argued that SSR 96-

22  7p sets forth mandatory factors that an ALJ must analyze); *Collins v. Astrue*, 2009 WL 1202891, *6

23  (C.D. Cal. Apr.27, 2009); *O'Neal v. Barnhart*, 2006 WL 988253, *12 n. 7 (C.D. Cal. Apr.13, 2006).

24  Instead, the ALJ must give consideration to these factors.  *See* SSR 96-7p.

25      In this case, the record as a whole reflects adequate consideration of these factors.  For

26  instance, the ALJ considered Plaintiff's testimony regarding her daily activities (AR 60), the

27  location, duration, frequency, and intensity of her pain and other symptoms (AR 60-62), the factors

28

that precipitate and aggravate the symptoms (AR 29-30), the type, effectiveness, and side effects of any medication (AR 60), her treatment (AR 61-62), any measures other than treatment to relieve pain or other symptoms (AR 60) and any other factors concerning her functional limitations and restrictions (AR 60, 61).  The ALJ also received testimony regarding Plaintiff's work history.  AR 10-16, 40.

As Plaintiff contends, the ALJ found that the medical evidence did not support Plaintiff's allegations of severe pain and its disabling effects.  Plaintiff argues this is error because an ALJ may not discount a claimant's credibility solely because it is not corroborated by objective medical findings.  "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir.2001).  Here, the ALJ did not limit his consideration solely to a lack of objective evidence.  The ALJ considered, among other things, inconsistencies in Plaintiff's claims concerning pain, inconsistencies in Plaintiff's testimony and reports, Plaintiff's behaviors and activities, and her longitudinal medical history, in addition to the objective medical evidence.  As to the lack of objective evidence, the ALJ noted Dr. Roberson's findings that Plaintiff had normal motor strength, muscle bulk and tone and had a normal neurological examination.  AR 61, 228-31.  The ALJ also noted Plaintiff's report that she was miserable because of pain in June 2007, but a September 2007 MRI of her cervical spine showed only mild narrowing and compression.  AR 61-62, 404.

Plaintiff additionally argues that the ALJ improperly rejected her testimony that she could stand 15 minutes, walk three blocks and sit 30 minutes at one time.  The  ALJ rejected this testimony by noting Plaintiff's inconsistent reports regarding her physical limitations.  As noted above, in weighing a claimant's credibility, one factor an ALJ may consider includes inconsistent testimony.  *Tonapetyan*, 242 F.3d at 1148; *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  In this case, the ALJ contrasted a previous written statement that she could stand for two hours, sit for two hours and walked 1½ miles a week.  He also noted that she testified to performing basic household chores and

17

1   shopping as needed.  AR 60, 109-110.

2       Plaintiff argues that the ALJ improperly rejected testimony that she could lift and carry no

3   more than five pounds with her left upper extremity.  However, the ALJ found no medical evidence

4   of weakness in the record.  AR 62.  Similarly, the ALJ rejected Plaintiff's claims that she had

5   difficulty grasping and holding things based on evidence that she only had mild carpal tunnel

6   syndrome of her left upper extremity and does not drop things.  AR 61.

7       Plaintiff also complains that the ALJ rejected her testimony regarding her ability to

8   concentrate.  As a practical matter, however, the ALJ partially credited Plaintiff's testimony, finding

9   that she had slightly limited attention, concentration, understanding, and memory because her pain

10   required occasional medication.  AR 59.  There was no other evidence of a severe mental

11   impairment.  AR 62, 353, 354-55.

12       B.   Dr. Aquino's Opinion

13       Plaintiff asserts that the ALJ erred by failing to proffer a reason for rejecting Dr. Aquino's

14   determination that she was limited to occasional feeling and reaching.  AR 333.  Plaintiff's assertion

15   lacks merit.

16       As an initial matter, an ALJ need not believe everything a physician sets forth, and may

17   accept all, some, or none of the physician's opinions.  *Magallanes v. Bowen*, 881 F.2d 747, 753-754

18   (9th Cir. 1989).  Although the ALJ did not specifically state that he was rejecting Dr. Aquino's

19   feeling and reaching limitation, it is clear that he both considered it and applied it to Plaintiff's left

20   upper extremity.  An ALJ need not recite a magical "incantation" expressly rejecting a physician's

21   opinion.  *Id.* at 755.  Rather, a reviewing court is "not deprived of [its] faculties for drawing specific

22   and legitimate inferences from the ALJ's opinion" if those inferences are there to be drawn.  *Id.*

23       Here, the ALJ thoroughly summarized Dr. Aquino's examination and conclusions.  As part of

24   this summary, the ALJ noted Dr. Aquino's findings that Plaintiff had no muscle atrophy, no tightness

25   of the muscles and only mild sensory deficits that did not correspond with her areas of pathology.

26   The ALJ also considered Dr. Aquino's assessment that Plaintiff could occasionally reach or feel.  AR

27   61.  However, the ALJ ultimately found that Plaintiff's reaching with her left, non-dominant upper

28

extremity was moderately limited overhead and that she had a slight fine and gross manipulation restriction with her left upper extremity as well.  AR 62.  In so doing, the ALJ took into account Plaintiff's testimony that she was disabled by pain on the left side of her neck down to her left arm.  Indeed, Plaintiff testified that she had no problems reaching in front of her or to the side.  Instead, she limited her problems to overhead reaching with her left arm and grasping with her left hand.  As to feeling, Plaintiff testified that she had numbness and tingling only in her left hand.  AR 26-29.  The ALJ also cited a nerve conduction study revealing mild carpal tunnel syndrome of her left upper extremity.  AR 60, 61.  Thus, it is readily apparent that the ALJ applied Dr. Aquino's generalized limitations in reaching and feeling to Plaintiff's left upper extremity based on Plaintiff's more specific testimony and on the objective medical evidence.

C.     Opinions of Treating Physicians, Drs. Bueff and LeFevre

*Dr. Bueff*

Plaintiff first argues that the ALJ erred in rejecting Dr. Bueff's opinion that she could not work.  However, the ALJ properly reasoned that Dr. Bueff's opinion was not directed at a medical issue.  A doctor's statement about a claimant's ability to work is not a proper medical source opinion, but an administrative finding reserved to the Commissioner.  Social Security Ruling ("SSR") 96-5p.  Disability has both a medical and vocational component. *See* 20 C.F.R. § 404.1560.  Because a medical source does not have the expertise to comment on the vocational component of disability, a statement by a medical source that a person is unable to work is not accorded much weight. *See* 20 C.F.R. § 404.1527(e)(1).

Additionally, the ALJ noted that Dr. Bueff's statement did not address medical issues such as Plaintiff's specific functioning or why her disability arose on the date of surgery.  The statement also did not identify supporting diagnoses or clinical findings, noting it was primarily "pain."  AR 355-57.  Finding Dr. Bueff's opinion "conclusory," the ALJ appropriately assigned it little weight.  An ALJ need not accept a treating physician's opinion that is conclusory, brief and unsupported by clinical findings. *Tonapetyan*, 242 F.3d at 1149; *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992); *Magallanes*, 881 F.2d at 751.

1    *Dr. LeFevre*

2         As with Dr. Bueff's opinion, Plaintiff contends that the ALJ erred in assigning less weight to

3    the opinion of treating physician, Dr. LeFevre.

4         Treating physicians are owed considerable deference.  *Edlund v. Massanari*, 253 F.3d 1152,

5    1157 (9th Cir.2001).  However, their opinions can "be rejected for specific and legitimate reasons

6    that are supported by substantial evidence in the record." *Id.* (internal quotation marks omitted).  The

7    "reasons must be sufficiently specific to make clear to any subsequent reviewers the weight the

8    adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

9    (internal quotation marks omitted).  "The ALJ is responsible for determining credibility, resolving

10   conflicts in medical testimony, and resolving ambiguities." *Id.* at 1156.

11        Here, the ALJ considered Dr. LeFevre's opinion and provided specific and legitimate reasons

12   for according it less weight.  AR 62.  First, the ALJ rejected Dr. LeFevre's statement that Plaintiff

13   had weakness in her arm because treatment records did not identify any significant arm weakness.

14   AR 62.  A lack of supporting clinical findings is a valid reason for rejecting a treating physician's

15   opinion.  *Magallanes*, 881 F.2d at 751; *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d

16   1190, 1195 (9th Cir. 2004) (ALJ properly discounted or assigned minimal weight to treating

17   physician opinions that were unsupported by objective evidence and that lacked substantive medical

18   findings); *Holohan v. Massanari,* 246 F.3d 1195, 1202 n. 2 (9th Cir. 2001) (stating that a physician's

19   opinion may be "entitled to little if any weight" where the physician "presents no support for her or

20   his opinion").  According to the record, Plaintiff complained of weakness and pain in her left arm

21   and hand, but an October 2005 EMG/NCS showed only mild carpal tunnel syndrome.  AR 182, 195.

22   When she was examined by Dr. Aquino in March 2007, there was no evidence of muscle atrophy in

23   the upper extremities.  Although she had mild sensory deficits, there was no specific dermatome

24   distribution corresponding to her areas of pathology.  AR 330-34.  In August 2007, Plaintiff had no

25   focal weakness/atrophy in her left upper extremity and an electrodiagnostic study of her left hand

26   was normal.  AR 377-78.  In September 2007, she had normal left arm strength.  AR 456.  As the

27   record lacks objective evidence and substantive medical findings demonstrating any arm weakness,

28                                                    20

1   the ALJ did not err by rejecting Dr. LeFevre's unsupported statement.

2        Second, the ALJ rejected Dr. LeFevre's statements that Plaintiff suffered from severe pain

3   with any neck movement and was unable to turn from side to side.  Although the ALJ acknowledged

4   that Plaintiff had a limited range of motion of her cervical spine, he reasoned that this had more to do

5   with her cervical fusion than with intractable pain.  AR 62.  The ALJ's determination is consistent

6   with the examination completed by Dr. Aquino, who found that Plaintiff had limited range of motion

7   of her cervical spine due to her surgical fusion.  AR 333.  "[W]hen an examining physician provides

8   independent clinical findings that differ from the findings of the treating physician, such findings are

9   substantial evidence.  Independent clinical findings can be either (1) diagnoses that differ from those

10  offered by another physician and that are supported by substantial evidence, or (2) findings based on

11  objective medical tests that the treating physician has not herself considered."  *Orn v. Astrue*, 495

12  *F.3d 625, 632 (9th Cir. 2007)* (Internal quotations and citations omitted).  Dr. Aquino's assessment

13  was based on independent clinical findings.  Specifically, Dr. Aquino noted that Plaintiff was able to

14  ambulate with a normal gait pattern; was able to tolerate sitting during the examination; had no

15  evidence of muscle atrophy in her extremities; had strength of 5/5 throughout the upper and lower

16  extremities; and had symmetric and brisk reflexes.  Although she had tenderness to palpation over

17  the cervical paraspinals and spine, she had no other tender areas in the back and no tightness of the

18  upper trapezius muscles.  Tellingly, she had no significant motor deficits.  AR 330-33.  In contrast,

19  there is no indication that Dr. LeFevre completed a similar examination of Plaintiff at the time he

20  filled out his Questionnaire.  AR 358-59, 377-78.  Accordingly, the ALJ properly considered that

21  Plaintiff's range of motion issues were the result of her cervical spine fusion, and not intractable

22  pain.

23        Third, and finally, the ALJ rejected Dr. LeFevre's assessment that she could sit, stand or walk

24  for 15 minutes at a time and that she must lie down for 3 hours each day based on Plaintiff's account

25  of her daily activities.  AR 62.  A claimant's daily activities provide a relevant basis for rejecting a

26  treating physician's opinion.  *See*, *e.g.*, *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601-

27  *02 (9th Cir. 1999)*.  Here, the ALJ noted that Plaintiff could perform a variety of tasks, including

28                                      21

1   preparation of meals once or twice a day, washing dishes three times a week, sweeping twice a

2   month, dusting four times a month, going shopping twice a month and making her bed twice a week.

3   AR 19-20, 62.  Indeed, contrary to Dr. LeFevre's assessment, Plaintiff testified that she could sit

4   about 30 minutes, could walk about three blocks and needed to lie down about 2 hours during the

5   day.  AR 26, 35.  In sum, the ALJ provided specific and legitimate reasons, supported by the record,

6   for discounting Dr. LeFevre's opinion.

7       Plaintiff appears to reject the ALJ's analysis of the medical record, citing the treatment

8   records of Drs. Bueff and LeFevre.  However, Plaintiff's interpretation of those records does not

9   render the ALJ's findings and conclusions improper.  As noted above, Dr. Bueff provided few, if

10   any, objective findings to support his non-medical opinion about Plaintiff's inability work.

11   Similarly, the ALJ cited the unsupported nature of particular aspects of Dr. LeFevre's opinion, along

12   with contradictory medical evidence.  *Magallanes*, 881 F.2d at 750 (the court must uphold the ALJ's

13   decision where the evidence is susceptible to more than one rational interpretation).

14       Based on the above, the ALJ's analysis of the medical opinions is supported by substantial

15   evidence and free of legal error.

16       D.    Mental Impairments

17       In this case, the ALJ determined that Plaintiff did not have a severe mental impairment at step

18   two of the sequential evaluation process.  Plaintiff does not take issue with the ALJ's step two

19   determination.  Rather, Plaintiff argues that the ALJ failed to properly consider the effects of

20   Plaintiff's mental impairments in her residual functional capacity.  The Court disagrees.

21       In making a residual functional capacity assessment, an ALJ is required to consider even

22   medically determinable impairments that are not severe under step two, as well as the limiting effects

23   thereof. *See* 20 C.F.R. §§ 404.1545(a)(2), 404.1545(e).  Here, in assessing Plaintiff's RFC, the ALJ

24   relied on Dr. Gill's psychiatric report completed in July 2007, which noted only "mild symptoms."

25   AR 62.  As a practical matter, Plaintiff does not address this portion of Dr. Gill's opinion, nor does

26   she address Dr. Gill's additional findings that she had a logical thought process, normal

27   concentration, normal attention, fair insight and good judgment.  AR 352-53.  Indeed, Dr. Gill did

28                                            22

1  not assign any limitations to Plaintiff's mental functional capacity.  Insofar as Plaintiff relies on Dr.

2  Gill's diagnosis of depression, major, recurrent, this is insufficient.  The mere diagnosis of an

3  impairment is not sufficient to sustain a finding of disability.  *Key v. Heckler*, 754 F.2d 1545, 1549

4  (9th Cir. 1985).

5        Further, the ALJ accurately observed that Plaintiff was referred to Dr. Gill by her attorney.

6  AR 62.  There is no indication that he discounted Dr. Gill's opinion for this reason.  Rather, the ALJ

7  noted that Plaintiff did not want any follow-up treatment and there was no indication that her

8  depression met the durational requirement.  AR 62.  Although Plaintiff asserts that record evidence

9  demonstrates depression from the date of her surgery through the hearing decision, Plaintiff does not

10  direct the court to such longitudinal evidence.  The court notes that Plaintiff denied depression in

11  February 2007.  AR 527.  Plaintiff also does not cite to medical evidence of functional limitations or

12  evidence of more than mild symptoms.  In fact, Dr. Gill identified only transient symptoms in August

13  2007.  AR 354-55.

14        Based on the above, the ALJ properly evaluated evidence of any mental impairment.

15        E.        RFC Finding and Vocational Expert Testimony

16        As a final matter, Plaintiff asserts that the VE's testimony has no evidentiary value because

17  the ALJ's hypothetical question did not reflect her actual limitations.

18        The hypothetical posed to the vocational expert must accurately reflect the claimant's

19  physical and mental limitations that are determined credible and supported by the record.  However,

20  the ALJ may exclude restrictions in the hypothetical that are unsupported by the record or discredited

21  as unreliable.  *Osenbrock v. Apfel*, 240 F.3d 1157, 1163-64 (9th Cir.2001); *DeLorme v. Sullivan*, 924

22  F.2d 841, 850 (9th Cir.1991); *Embrey v. Bowen*, 849 F.2d 418, 423 (9th Cir. 1988).

23        As discussed above, the ALJ properly accounted for Plaintiff's mental and physical

24  limitations.

25                          **RECOMMENDATION**

26        Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial

27  evidence and is based on proper legal standards.  Accordingly, the Court RECOMMENDS that

28                                    23

Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be DENIED and that JUDGMENT be entered for Defendant Michael J. Astrue and against Plaintiff Pamela Kruse.

These findings and recommendations will be submitted to the Honorable Lawrence J. O'Neill pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within thirty (30) days after being served with these findings and recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

   **Dated:    May 26, 2011                     /s/ Dennis L. Beck**
                                          UNITED STATES MAGISTRATE JUDGE